United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 22, 1998 Decided June 26, 1998 

 No. 95-1093

 Florida Power & Light Company, 

 Petitioner

 v.

 Environmental Protection Agency, 

 Respondent

 On Petition for Review of Actions of the 

 Environmental Protection Agency

 Douglas H. Green argued the cause and filed the briefs for 
petitioner with whom Norman L. Rave, Jr. was on the brief.

 Seth M. Barsky, Attorney, U.S. Department of Justice, 
argued the cause for respondent, with whom Lois J. Schiffer, 
Assistant Attorney General, and Jonathan Z. Cannon, Gener-
al Counsel, Environmental Protection Agency, were on the 
brief.


 Before: Edwards, Chief Judge, Sentelle and Garland, 
Circuit Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: Petitioner Florida Power and Light 
Company ("Florida P&L" or "the company") petitions for 
review of two statements made in the preamble to a proposed 
rule relating to the requirements a state must meet to be 
authorized to administer certain aspects of the Resource 
Conservation and Recovery Act of 1976, Pub. L. No. 94-580, 
90 Stat. 2795 (1976) ("RCRA"). We dismiss the petition for 
lack of statutory jurisdiction because the preamble state-
ments are not final regulations within the meaning of RCRA 
s 7006(a), 42 U.S.C. s 6976(a) (1994). Moreover, even as-
suming that the court otherwise had jurisdiction, it is clear 
that Florida P&L's claims are not ripe for review.

 I. Background

 A.Statutory and Regulatory Background

 Congress enacted the RCRA to address increasingly seri-
ous environmental and health dangers arising from waste 
generation, management, and disposal. Congress was partic-
ularly concerned with the management and disposal of "haz-
ardous wastes," for which it provided comprehensive "cradle-
to-grave" regulation in RCRA Subtitle C. See 42 U.S.C. 
ss 6921-6934 (1982) (current version at 42 U.S.C. ss 6921-
6939e (1994)); United Technologies Corp. v. EPA, 821 F.2d 
714, 716 (D.C. Cir. 1987).

1.Interim Status of Waste Treatment Facilities

 The RCRA requires facilities that treat, store, or dispose of 
hazardous waste to obtain a permit from either the United 
States Environmental Protection Agency ("EPA" or "the 
Agency") or an authorized state. 42 U.S.C. s 6925(a)-(c) 
(1994). Recognizing that EPA could not issue permits to all 
affected facilities before the RCRA's effective date, Congress 
provided that existing facilities meeting certain requirements 
could operate on an "interim status" basis until final agency 


action could be taken on a facility's permit application. 42 
U.S.C. s 6925(e). 

2.Corrective Action Authority

 "As originally enacted, RCRA did not require permittees to 
take significant remedial action to correct past mismanage-
ment of hazardous waste." American Iron & Steel Inst. v. 
EPA, 886 F.2d 390, 393 (D.C. Cir. 1989) (internal quotation 
marks and citations omitted). In part to address the concern 
that releases from RCRA facilities posed a threat to human 
health and the environment, Congress amended the RCRA 
with the Hazardous and Solid Waste Amendments of 1984, 
Pub. L. No. 98-616, 98 Stat. 3221 (1984) ("HSW Amend-
ments"). Id. In the HSW Amendments, Congress signifi-
cantly expanded EPA's authority to require facilities to un-
dertake "corrective action" to address hazardous releases at 
RCRA treatment, storage, and disposal facilities. With re-
spect to permitted facilities, section 3004(u) provides that any 
permit issued to a facility after November 8, 1984 "shall 
require ... corrective action for all releases of hazardous 
waste or constituents from any solid waste management unit 
at a treatment, storage, or disposal facility seeking a permit 
under this subchapter, regardless of the time at which waste 
was placed in such unit." 42 U.S.C. s 6924(u). In section 
3008(h), Congress provided EPA with corresponding authori-
ty to require corrective action at interim status facilities. See 
42 U.S.C. s 6928(h).

 3. State Authorization

 Under the RCRA, EPA may authorize states to administer 
and enforce their own hazardous waste programs within the 
state. 42 U.S.C. s 6926(b). EPA will approve a state's 
request for authorization if it determines, among other things, 
that the state's program is equivalent to and consistent with 
the federal one and provides for "adequate enforcement of 
compliance" with the RCRA's requirements. Id. Following 
authorization, EPA retains its full enforcement authority, 
although authorized states have primary enforcement respon-
sibility. See Waste Management of Illinois, Inc. v. EPA, 945 
F.2d 419, 420 (D.C. Cir. 1991).


 Florida received authorization to administer the "base" 
RCRA program in 1985. See 50 Fed. Reg. 3,908 (1985). This 
authorization gave Florida responsibility for permitting facili-
ties and certain other aspects of the RCRA program. Id. at 
3,908-09. However, Florida never has been authorized to 
administer any aspect of the corrective action program under 
RCRA s 3008(h), 42 U.S.C. s 6928(h). See 63 Fed. Reg. 
2,896, 2,897 (1998). Accordingly, administration and enforce-
ment of the corrective action program in Florida has been 
and remains the responsibility of EPA.

 B.Development of EPA Policy Pertaining to EPA's Correc-
 tive Action Authority

 1. The 1990 Proposed Rule

 On July 27, 1990, EPA proposed regulations to govern the 
corrective action program and included in the preamble a 
discussion addressing several issues related to section 
3008(h). 55 Fed. Reg. 30,798 (1990) ("1990 Proposed Rule"). 
In setting forth the background for the proposed rule, EPA 
explained that "[s]ection 3008(h) provides EPA with authority 
... to require corrective action or other measures, as appro-
priate, when there is or has been a release of hazardous waste 
or hazardous constituents from a RCRA facility operating 
under interim status." Id. at 30,799. The preamble then 
noted that a "detailed discussion of the Agency's interpreta-
tion of the section 3008(h) authority was provided in a Decem-
ber 16, 1985 guidance memorandum entitled "Interpretation 
of section 3008(h) of the Solid Waste Disposal Act." Id. at 
30,800 (citing Memorandum from J. Winston Porter, Assis-
tant Administrator, Office of Solid Waste and Emergency 
Response, dated December 16, 1985 (hereinafter "Porter 
Guidance"), reprinted in Joint Appendix ("J.A.") 24)). The 
proposal's preamble also addressed the reach of EPA's sec-
tion 3008(h) authority, stating that "[c]orrective action may be 
required under section 3008(h) whether the facility is operat-
ing (prior to receiving a permit) under interim status, is 
closing or is closed under interim status, has lost interim 
status, or failed to properly obtain interim status." Id. at 
30,855 (emphasis added).


 EPA has promulgated only a few sections of its 1990 
Proposed Rule in final form. See 58 Fed. Reg. 8,658 (1993). 
On May 1, 1996, EPA published an advance notice of pro-
posed rulemaking outlining EPA's strategy for promulgating 
future regulations governing the corrective action process. 
See 61 Fed. Reg. 19,432 (1996).

 2. The 1994 Proposed Rule

 On November 8, 1994, as part of EPA's efforts to create a 
consistent approach to cleanups at RCRA permitted and 
interim status facilities, EPA proposed revisions to the re-
quirements for state authorization. 59 Fed. Reg. 55,778 
(1994) ("1994 Proposed Rule"). Since July 15, 1985, EPA has 
required states to have corrective action authority over per-
mitted facilities comparable to EPA's section 3004(u) authori-
ty for the state to obtain authorization for that portion of the 
HSW Amendments corrective action program. Id. at 55,788. 
The 1994 Proposed Rule would have for the first time re-
quired states also to have corrective action authority at 
interim status facilities comparable to EPA's section 3008(h) 
authority to obtain state authorization. Id.

 Florida P&L challenges two preamble statements in the 
1994 Proposed Rule concerning requirements for authoriza-
tion of state corrective action programs. The first statement 
recites EPA's interpretation that the RCRA's interim status 
corrective action provision, section 3008(h), 42 U.S.C. 
s 6928(h), authorizes EPA to respond to releases from "facili-
ties that have, had, or should have had authorization to 
operate under interim status." 59 Fed. Reg. at 55,789 (citing 
Porter Guidance). The second statement provides EPA's 
view that section 3008(h) enables EPA to respond to "releases 
of hazardous waste or hazardous constituents" at interim 
status facilities. Id.

 EPA has yet to take final action on the 1994 Proposed 
Rule.

 C.EPA Investigation of Florida P&L Facilities

 Until approximately 1988, Florida P&L operated surface 
impoundments for the management of corrosive hazardous 


wastes at nine different facilities in Florida. Each of these 
facilities had obtained interim status shortly after EPA's 
promulgation of RCRA hazardous waste regulations in 1980. 
According to Florida P&L, each of these interim status 
facilities was "clean closed" in conformance with 40 C.F.R. 
Part 264.

 As part of its inspection and enforcement program, EPA 
Region 4 notified the company that it intended to conduct 
visual site inspections at several Florida P&L facilities. EPA 
officials at Region 4, with the consent of Florida P&L, have 
conducted these inspections at some, but not all, of Florida 
P&L's nine facilities. Although company officials have con-
sented to EPA investigations, they have never agreed that 
EPA has the authority to pursue these actions. In particular, 
company officials have maintained that EPA has no authority 
under section 3008(h) to inspect the facilities in question. 
The parties have been engaged in negotiations over the last 
few years in an effort to resolve this and other issues. To 
date, EPA has not issued a RCRA s 3008(h) order to any 
Florida P&L facility.

 II. Analysis

A. Finality 

 Florida P&L seeks review of preamble statements in the 
1994 Proposed Rule under RCRA s 7006(a), 42 U.S.C. 
s 6976(a). Section 7006(a) provides for judicial review of 
final regulations issued pursuant to the RCRA. 42 U.S.C. 
s 6976(a). This court has recently identified three criteria 
for determining when an EPA regulatory action constitutes 
promulgation of regulations within the meaning of section 
7006(a): (1) the Agency's own characterization of the action; 
(2) whether the Agency published the action in the Federal 
Register or the Code of Federal Regulations ("CFR"); and 
(3) whether the action has binding effects on either private 
parties or the Agency. See American Portland Cement 
Alliance v. EPA, 101 F.3d 772, 776 (D.C. Cir. 1996); see also 
Kennecott Utah Copper Corp. v. DOI, 88 F.3d 1191, 1207 
(D.C. Cir. 1996) (interpreting "regulation" under an analogous 


judicial review provision as "a statement that has general 
applicability and that has the legal effect of binding the 
agency or other parties") (internal quotation marks and cita-
tions omitted).

 Here, the Agency has never characterized the challenged 
statements as final or applied them as binding. While the 
statements were published in the Federal Register, Ameri-
can Portland Cement indicated that "the real dividing point 
between regulations and general statements of policy is publi-
cation in the Code of Federal Regulations." American Port-
land Cement, 101 F.3d at 776. In deciding that the regulato-
ry determination in that case was not a final regulation for 
the purposes of judicial review under RCRA s 7006(a), 42 
U.S.C. s 6976(a), the court found the fact that the regulatory 
determination had not been published in the CFR to be more 
important than that it had been published in the Federal 
Register. See id. at 776-77.

1.The Challenged Statements Have Never Been Charac-
 terized as a Final Rule

 On its face, the action at issue is merely a proposed, not a 
final, rulemaking. Although the challenged statements are 
consistent with previous policy statements of EPA, the par-
ties agree that the challenged preamble statements appear 
for the first time in a proposed rulemaking, and are not 
simply a reiteration of existing interpretive rules. Further-
more, there is nothing to indicate that EPA intended to 
promulgate a definitive rule concerning the scope of its 
section 3008(h) authority. Indeed, that EPA is still in the 
process of clarifying the scope of its own corrective action 
authority is evidenced by the fact that it has yet to promul-
gate final rules on many of the issues addressed in the 1990 
Proposed Rule.

2.EPA Has Not Applied the Challenged Statements as 
 Binding

 In addition, Florida P&L has failed to show that the 
challenged statements have any binding effects on either 
private parties or the Agency. Florida P&L claims that the 
preamble statements are "final interpretive rules" because 


EPA purportedly has applied the challenged statements as 
binding on the company. Significantly, however, Florida 
P&L does not claim that the preamble statements themselves 
had a binding effect on the company. Rather, Florida P&L 
relies on a September 30, 1994 letter from EPA Region 4 
notifying the company of EPA's intention to conduct a visual 
site inspection at one of Florida P&L's facilities and a June 
21, 1996 letter from EPA Region 4 responding to objections 
raised by the company to EPA's inspections at its facilities. 
See Pet. Br. at 11 & Appendix at 1, 10.

 It is worth noting that the September 30, 1994 letter 
predates the challenged November 8, 1994 preamble state-
ments. Thus, it is unclear how this EPA letter can be seen to 
apply statements that had yet to be published when the letter 
was sent.

 Moreover, to the extent that both letters can be read as 
preliminary steps to taking enforcement action against Flori-
da P&L pursuant to section 3008(h), the enforcement action is 
being taken by EPA directly, and not by the state of Florida 
pursuant to a state corrective action program authorized 
under the challenged proposed regulations. Thus, if any-
thing, the letters follow from EPA's understanding of its 
section 3008(h) authority as explained in the 1990 Proposed 
Rule, which discusses EPA's authority to enforce section 
3008(h), not the EPA's proposed requirements that states 
have similar authority in order to be authorized to enforce 
section 3008(h), which is the topic of the 1994 Proposed Rule 
challenged here. If Florida P&L's petition were to be con-
strued as a challenge to the 1990 Proposed Rule, it would be 
time-barred. See RCRA s 7006(a)(1), 42 U.S.C. s 6976(a)(1) 
(requiring petitions for review of final regulations promulgat-
ed pursuant to the RCRA to be "filed within ninety days"); 
American Iron & Steel, 886 F.2d at 397-98 (dismissing for 
lack of jurisdiction late-filed challenge to RCRA regulations).

 In any event, these letters, without more, have no binding 
effect on Florida P&L. See FTC v. Standard Oil Co., 449 
U.S. 232, 242-43 (1980) (agency action that only serves to 


initiate proceedings is not binding); Air California v. DOT, 
654 F.2d 616, 620-21 (9th Cir. 1981) (agency letter alleging 
statutory violations and warning of possible injunctive and 
civil penalty remedies did not constitute final agency action). 
Florida P&L asserts that EPA "has coerced [Florida P&L] 
into performing corrective action under the threat of enforce-
ment of [the challenged statements]." Reply Br. at 7. It 
describes its present "predicament" as one in which it "must 
voluntarily comply with undertaking a corrective action pro-
gram it believes to be unlawful or face the imposition of an 
enforcement order and associated civil penalties." Id. at 13. 
However, Florida P&L does not and cannot deny that it could 
choose not to permit EPA to access its facilities, in which case 
EPA would have to decide whether to issue a 3008(h) order 
against Florida P&L or move on to other enforcement priori-
ties.

 If EPA issued a 3008(h) order against Florida P&L, the 
company would have ample opportunity to raise its objections 
to EPA's interpretation of its section 3008(h) authority in 
administrative and, ultimately, judicial proceedings challeng-
ing the order. EPA regulations provide for informal adjudi-
cation prior to the issuance of a final corrective action order. 
See 40 C.F.R. Part 24; Chemical Waste Management, Inc. v. 
EPA, 873 F.2d 1477, 1478 (D.C. Cir. 1989) (upholding infor-
mal hearing procedures contained in 40 C.F.R. Part 24). 
Even after becoming final, however, a RCRA s 3008(h) cor-
rective action order is not self-executing. To compel compli-
ance with an order, the EPA must seek appropriate relief 
through either a civil action or in an administrative proceed-
ing before an administrative law judge appealable to EPA's 
Environmental Appeals Board. See RCRA s 3008(a), (h), 42 
U.S.C. s 6928(a), (h); 40 C.F.R. Parts 22, 24. A decision of 
the Environmental Appeals Board concerning a corrective 
action order would presumptively be reviewable under the 
Administrative Procedure Act ("APA"), as there is no indica-
tion that Congress intended to preclude review of such deci-
sions or otherwise commit such decisions solely to agency 
discretion. See 5 U.S.C. s 701(a) (agency actions are judicial-
ly reviewable "except to the extent that (1) statutes preclude 
judicial review; or (2) agency action is committed to agency 


discretion by law"); Natural Resources Defense Council, Inc. 
v. SEC, 606 F.2d 1031, 1043 (D.C. Cir. 1979) (APA "creates a 
strong presumption of reviewability that can be rebutted only 
by a clear showing that judicial review would be inappropri-
ate").

 The cases on which Florida P&L relies in support of its 
contention that the challenged preamble statements are re-
viewable by this court in the present context are clearly 
distinguishable. In McLouth Steel Products Corp. v. Thom-
as, 838 F.2d 1317 (D.C. Cir. 1988), the binding nature of the 
policy statement at issue was exhibited through EPA's denial 
of the petitioner's petition for delisting, a formal agency 
action similar to a RCRA order. No equivalent agency action 
has been taken to date in the instant case. JEM Broadcast-
ing Co. v. FCC, 22 F.3d 320 (D.C. Cir. 1994), involved judicial 
review of final agency action (summary dismissal of a license 
application) and was not construed as review of a regulation 
or rule--in fact, the JEM court held that the petitioner's 
attempt to challenge the rule providing the basis for dismissal 
in the context of the adjudication was time-barred. See 22 
F.2d at 324; see also id. at 325 (distinguishing cases in which 
earlier challenge to rule found to be unripe). The central 
issue in Ciba-Geigy Corp. v. EPA, 801 F.2d 430 (D.C. Cir. 
1986) was what procedures the agency must follow before 
imposing penalties on a regulated entity. In contrast, in the 
instant case, Florida P&L is clearly entitled to challenge the 
EPA's alleged interpretation of its corrective action authority 
under RCRA s 3008(h) in an adjudicatory procedure before 
any penalties could be enforced against Florida P&L pursu-
ant to this authority. In Syncor Int'l Corp. v. Shalala, 127 
F.3d 90 (D.C. Cir. 1997), the court addressed whether the 
policy statement at issue was an interpretive rule subject to 
the governing statute's notice and comment rulemaking re-
quirements. Here, Florida P&L does not urge that the 
challenged preamble statements were not subject to notice 
and comment--indeed, the company offered comments on the 
proposed rule--and thus Syncor is inapposite. Finally, in 
Edison Electric Inst. v. EPA, 996 F.2d 326 (D.C. Cir. 1993), 
the court's decision that the policy statement at issue was 


reviewable hinged on a determination that the challenged 
statement effectively reopened a prior regulation and, thus, 
the challenge was really to the substance of the prior final 
regulation. See 996 F.2d at 331-32 (explaining "reopener 
doctrine"). Florida P&L does not invoke the reopener doc-
trine here.

 Florida P&L also attempts to rely on Kennecott. In fact, 
this case supports EPA's position, not that of Florida P&L. 
In Kennecott, this court held that "a preamble may under 
some circumstances be reviewable." 88 F.3d at 1222. How-
ever, where the petitioners "have not demonstrated that the 
[challenged] preamble has a direct and immediate rather than 
a distant and speculative impact upon them," the court "must 
await a concrete case where we can probe the limits of the 
rule in the context of a live controversy involving actual 
events." Id. at 1223. The court reasoned:

 Unless and until [the agency] invokes the preamble in an 
 attempt to affect the outcome of a real dispute, there is 
 little need for and no factual basis to inform our inquiry 
 into its validity. Moreover, by awaiting a concrete case, 
 we will then be able to ascertain with assurance that [the 
 agency] intended to bind a party and that the party was 
 thereby aggrieved.

Id. Thus, Kennecott demonstrates how, in cases such as this, 
"the issues of reviewability and ripeness converge." Id.

 B.Ripeness

 Even assuming that Florida P&L were challenging a final 
interpretive rule, it is clear that its claims are not ripe for 
review. The ripeness doctrine "represents a prudential at-
tempt to balance the interests of the court and the agency in 
delaying review against the petitioner's interest in prompt 
consideration of allegedly unlawful agency action." Cronin v. 
FAA, 73 F.3d 1126, 1131 (D.C. Cir. 1996) (internal quotation 
marks and citations omitted). The Supreme Court estab-
lished the framework for reaching this balance in Abbott 
Laboratories v. Gardner, 387 U.S. 136 (1967), where the 
Court set forth a two-pronged test that requires a reviewing 


court first to evaluate the "fitness of the issues for judicial 
decision." Id. at 149. When a challenged decision is not "fit" 
for review, the petitioner must show "hardship" in order to 
overcome a claim of lack of ripeness. See id.; City of 
Houston v. HUD, 24 F.3d 1421, 1430-31 & n.9 (D.C. Cir. 
1994). The claims of Florida P&L fail the test of ripeness.

 Under the fitness prong, we inquire into whether the 
disputed claims raise purely legal, as opposed to factual, 
questions and "whether the court or the agency would benefit 
from postponing review until the policy in question has suffi-
ciently 'crystallized.' " Cronin, 73 F.3d at 1131. "The court's 
interests in avoiding unnecessary adjudication and in deciding 
issues in a concrete setting militate in favor of postponing 
review if, for example, the court finds that resolution of the 
dispute is likely to prove unnecessary or that the court's 
deliberations might benefit from letting the question arise in 
some more concrete form." Id. (internal quotation marks and 
citations omitted). The present petition for review is not 
based on crystallized EPA interpretations, but, rather, on 
Florida P&L's own interpretations of the preamble state-
ments and what could happen if those statements--as inter-
preted by Florida P&L--are applied to the company in an as-
yet-to-be-issued section 3008(h) order. The challenged rule is 
unclear with regard to whether or not it applies to "clean-
closed" facilities, and EPA has yet to issue or defend a formal 
order applying this rule to such facilities. Since it remains 
uncertain whether, or on what grounds, EPA would even 
apply this rule to clean-closed facilities, the specific question 
raised by Florida P&L is not fit for review at this time.

 In light of the lack of fitness of its claims, Florida P&L 
must demonstrate that postponing review will cause the 
company "hardship" in order to overcome a claim of lack of 
ripeness and obtain review of the challenged rule at this time. 
See City of Houston, 24 F.3d at 1431 n.9. Florida P&L is 
unable to demonstrate hardship because the company suffers 
no harm unless and until EPA or an authorized state issues a 
3008(h) corrective action order against it. See W.R. Grace & 
Co. v. EPA, 959 F.2d 360, 365-67 (1st Cir. 1992) (noting lack 


of ripeness where EPA has yet to take any final action under 
RCRA corrective action process). As explained above, in the 
event that the EPA takes such action, Florida P&L will have 
an opportunity to make the same arguments raised here in 
either district court or administrative proceedings. Civil 
penalties cannot be imposed on Florida P&L unless it chooses 
to disregard a corrective action order against it. The only 
conceivable hardship Florida P&L will endure as a result of 
postponement is the burden of participating in further admin-
istrative and judicial proceedings. Such claims, however, do 
not constitute sufficient hardship for the purposes of ripeness. 
Cronin, 73 F.3d at 1133 (challenge is unripe where complain-
ing party is free to challenge agency's regulations in context 
of specific enforcement action). Thus, Florida P&L's claims 
are not ripe for review at this time.

 III. Conclusion

 For the foregoing reasons, the petition for review is dis-
missed.

So ordered.